# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-22-00199-CR

---

**Sylvano Sanchez, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 33RD DISTRICT COURT OF BURNET COUNTY
### NO. 49217, THE HONORABLE J. ALLAN GARRETT, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Sylvano Sanchez was convicted by a jury of two counts of manslaughter and two counts of aggravated assault with a deadly weapon and sentenced to fifty years' confinement for each offense. *See* Tex. Penal Code §§ 12.33, 19.04(a), 22.02(a)(2). The trial court ordered that the sentences run concurrently. On appeal, Sanchez contends that the evidence presented at trial was legally insufficient to support his convictions, that extraneous-offense testimony during the punishment hearing was unfairly prejudicial, and that the State made an improper closing argument. We affirm the trial court's judgments of conviction.

## BACKGROUND

On the night of July 1, 2018, Sheldon Johnson, who had just retired from his position as pastor of a church in Goldthwaite, Texas, was driving with his family to the

Smithville home of Sherryl Orsak, his sister-in-law, with whom they were going to live. The family was traveling in two vehicles: Sheldon drove an SUV with his 13-year-old son Victor (Son) in the front passenger's seat, and Sheldon's wife Sharon (Wife) followed in a minivan with Orsak seated next to her. Shortly after midnight on July 2nd, as the vehicles headed south on U.S. 183, a northbound pickup truck driven by Sanchez collided first with the SUV and then with the minivan. Son and Wife were killed in the collision, and Sheldon and Orsak suffered extensive injuries.[1] Following the collision, Sanchez was arrested and charged with two counts of manslaughter, two counts of criminally negligent homicide, two counts of aggravated assault with a deadly weapon, and two counts of aggravated assault causing serious bodily injury.

At trial, the State presented testimony from four individuals who arrived at the scene soon after the crash: Andres Martinez, Thor Wallace, Tina Burris, and David Meintrup. Wallace testified that at the time of the crash, the weather was clear, and Meintrup testified that the stretch of road on which the crash occurred was "very dark" and that there was "limited traffic." Neither Wallace nor Meintrup had heard the sound of "squealing brakes" or "honking horns." Meintrup testified that vehicles were on both sides of the roadway, including a minivan or SUV in the southbound lanes, and that from the debris, "it looked like maybe the vehicles had touched and spun off." Wallace testified that the passenger's side of Sheldon's SUV was in a ditch and "gone, pretty much." Burris testified that as her car approached, Sanchez's truck was still "spinning."

The four witnesses also testified about Sanchez's actions and demeanor following the crash. Wallace testified that he helped Sanchez from his truck and "sat him right there at the

---

[1] The parties stipulated at trial that Victor and Sharon died "in a motor vehicle collision" between their vehicles and "a motor vehicle operated by the Defendant, Sylvano Sanchez."

2

front of the engine bay." Sanchez, who was bruised and cut, was silent and appeared "more confused." Martinez testified that he saw Sanchez exit the truck and heard him "asking around what had happened" and whether anyone had a cigarette. Burris likewise testified that she saw Sanchez walk away from the truck and ask for a cigarette before others helped him to lie down. She testified that she could smell alcohol but "wasn't too sure . . . if he had been drinking." Meintrup testified that Sanchez was "walking with some distress," so Meintrup asked him to lie down. Sanchez had "maybe some chest pain and also some head injuries." However, Meintrup testified that Sanchez did not want to lie down, seemed to be agitated or like "he wanted to go check on something," was possibly trying to return to his truck, and was "probably in some type of shock." Meintrup did not smell "anything on him."

Sheldon testified about the collision and the events preceding it. It had not rained on July 1st and was very dry. The road conditions were normal. He could clearly see the reflective lane markings on the road, and both his and Wife's headlights were activated. There was "not much traffic at all." Both the SUV and minivan were going approximately 60 to 65 m.p.h. because the vehicles were loaded with the family's belongings, and Sheldon "didn't want . . . to go too fast." Around 11:45 p.m., he and Wife drove through Briggs, Texas, before entering "a long straightaway." Sheldon had driven the area "[a]ll [his] life" and was familiar with that part of 183, which consisted of four lanes, two northbound and two southbound.

While on the straightaway, he noticed that an oncoming vehicle was rapidly approaching on the wrong side of the highway; the vehicle was "partially at least on the inside lane on the side of the road of the southbound lanes." Sheldon testified that he could see the vehicle's headlights "coming directly"; that the vehicle was heading toward them at a slant; and that it was "consistently coming over," was "not jerking," and was not "moving as if it had tried

3

to avoid something." He tried to swerve to the left but was not sure whether he made it to the inside southbound lane. The next thing he remembered was waking and seeing lights. He suffered multiple injuries from the collision, and had "a lot of emotional trauma."

Vickie Willoughby, a deputy medical examiner and forensic pathologist, performed Wife's and Son's autopsies. She testified that their cause of death was blunt force injuries and that she ruled their manner of death an accident, which "is a type of death that happens that is unexpected to the time and place of the event." Wife tested negative for alcohol, and the only drug indicated by her toxicology report was ibuprofen, an over-the-counter pain medication.

Dr. Kristopher Stockton, an orthopedic surgeon, reviewed Sheldon's and Orsak's medical records and testified to the extent of their injuries. He testified that Sheldon had multiple fractures and orthopedic injuries; that Orsak, who died of cancer before trial, suffered an ankle dislocation that caused fractures in the surrounding bone; and, when read the "definition under the law of 'serious bodily injury,'" that he believed that both Sheldon's and Orsak's injuries "would meet that definition."

DPS Trooper Dorian Turner testified about the results of inspections that he performed on the three vehicles involved in the July 2nd crash. He could tell from the debris field that it had been a high-speed crash, and all three vehicles suffered "very significant damage." Sanchez's truck had extensive damage to the front passenger's side. There was also damage to the truck's bed, which was "folding under," and the truck appeared to be almost bent. Its left-side tires had not experienced a blowout, and there would have been no reason for it to have pulled across the highway because of them. Its speedometer was "locked" at 105 m.p.h., which "could be an accurate depiction of the vehicle speed when the power is disconnected[,]

4

and the severity of the damage kind of traps that speedometer into place." The posted speed limit at the collision's location was 65 m.p.h. Trooper Turner observed beer cans, a cooler, and a bottle of pills in the truck and could smell the odor of an alcoholic beverage.

There was "very extensive damage" to Sheldon's SUV's passenger's side and front end; it appeared as if its "whole upper left" was missing. Although the driver's side was not as damaged, there was also pervasive damage to the vehicle's back right, which was "kind of folded back from the front to the back." Trooper Turner testified that there was nothing mechanical in the SUV that "could be a cause of the wreck."

Wife's minivan had substantial front-end damage, the majority of which was on the driver's side, which was "crushed from the front to the back into the driver's compartment." Trooper Turner saw "[n]othing at face value" that was "mechanically wrong with any of th[e] vehicles that could be a contributing factor to th[e] wreck."

DPS Trooper Garrett Huntington, the lead investigator in the case, testified about his investigation and conclusions. As a trooper, he had previously investigated approximately 300 collisions, seven or eight of which involved fatalities. He arrived at the crash scene at approximately 12:30 a.m. on July 2nd. The weather was clear, and the road conditions were dry and normal. At the scene, he spoke with Sanchez, who informed Trooper Huntington that he had been the truck's driver; that he had been alone; and that he had a commercial driver's license, which is "a license to operate large 18-wheeler type vehicles." From his observation of tire marks "starting on the . . . southbound side of the road going north," Trooper Huntington concluded that "the Dodge pickup was in the – on the wrong side of the road and struck the [SUV], then struck the minivan, and then came to rest further up on the northbound side of the road." He testified that the first area of impact occurred in the inside lane of the southbound

5

side, that the second area of impact occurred in the same lane "a little further back," that "the collision clearly occurred in the inside southbound lane," and that Sanchez's truck had been traveling north.

Trooper Huntington spoke with Sanchez again at Sanchez's home in Lampasas. Sanchez could not tell him about the crash and did not remember many details. However, he stated that "prior to the crash he remembered setting his cruise control at 60 [m.p.h.], that he saw a vehicle ahead of him "weaving kind of in and out of traffic," and that he "couldn't really explain" what made him think that or why he had failed to take evasive action.

During the interview, Sanchez was more certain regarding his actions earlier on the 1st. He left his home around 7 or 8 a.m. and drove to Rosharon to visit his son. Along the way, he stopped in Austin to look for his girlfriend, whose last name he could not remember, and "picked up a gentleman who he had never met before and took him on his trip to Rosharon." Sanchez arrived in Rosharon at approximately 12:45 p.m. and left for Lampasas at approximately 3:05 p.m. He dropped off his passenger, whose name he likewise did not know, in Austin. Trooper Huntington testified that Sanchez's trip to and from Rosharon would have taken "approximately eight hours and 34 minutes, including the visitation while he was in Rosharon. Then his travel time would have taken about ten hours and 55 minutes. And he spent an unknown amount of time in Austin." Sanchez's truck had an airbag control module (ACM), which tracks "everything that happens with the vehicle with an event or a crash," including speed, braking, turning, and other data.

Trooper Huntington testified that, in his opinion, Sanchez failed to control his speed, exceeded the speed limit at the time of the collision, failed to maintain a single lane of travel, failed to keep a proper lookout, failed to control his motor vehicle, failed to stay awake

6

while driving, and drove into oncoming traffic. Trooper Huntington concluded that these acts or omissions caused the collision, that "all of these factors combined contributed to th[e] collision," and that each factor on its own "might have caused the collision." He also testified that the same acts and omissions caused Sheldon's and Orsak's injuries and that Sanchez's truck was a deadly weapon. He characterized Sanchez's conduct as a "reckless action[]" and equated it with firing a gun in a crowd without intending to hit anyone.

On cross-examination, Trooper Huntington testified that he is not an accident reconstructionist and that he had concluded that Sanchez was tired "by deduction" and "sort of a hunch"; "pretty much there was no other logical explanation as to why he would have been on the other side of the road," and there were cigarette burn marks in his seatbelt, which possibly indicated that he had "been dozing off with the cigarette in his mouth." Trooper Huntington further testified that a search of Sanchez's phone indicated that Sanchez had not been using it during the collision and that, as a result of Sanchez's bloodwork, Trooper Huntington had ruled out drugs or alcohol as a factor contributing to the crash. Asked about a "transition" where U.S. 183 narrows from four lanes to two outside of Briggs, he testified that it is not "sudden" and that the collision occurred over a mile south of the transition.

DPS Sergeant Andrew Thomas testified that he forensically mapped the crash site approximately a week after the collision using markings put down by investigators. He testified that Sanchez's truck was found on its side; that the first area of impact was in a southbound lane of U.S. 183; and that there were no "tire marks, no braking" leading up to the area of impact. However, yaw marks were present, showing that a vehicle "made a sudden movement one way without applying the brakes." The yaw marks indicated that a vehicle had turned at a high rate of speed and began in the outside lane of U.S. 183 southbound, moving inward toward the north.

7

DPS Trooper Michael Bacon, an accident reconstructionist, testified about his analysis of the three vehicles' ACM reports, which each contained five seconds of pre-crash data. The report for Sanchez's truck was not interrupted or incomplete. Five seconds before the crash, the truck was going 107 m.p.h. and the accelerator pedal was 65% depressed. 2.3 seconds before the crash, the pedal was 15% depressed. Although it was briefly released, it was pressed again 1.9 seconds before the crash and was still depressed .6 seconds before impact. .1 seconds before the crash, the truck was going 105 m.p.h., and the engine throttle was at 10%. The truck's speed then plummeted, but Trooper Bacon testified that he would be reluctant to rely on reported speeds after 105 m.p.h. because the speed sensors would have been destroyed. One tenth of a second before the crash, the service brake had not activated, which he testified indicated that Sanchez never stepped on the brake.[2] Trooper Bacon also testified that in the three seconds preceding the collision, the truck's steering input indicated "somebody driving in a straight line." He further testified that he is aware that people sometimes press the wrong pedal, that pressing the wrong pedal would not explain why a vehicle was on the wrong side of the road, that the truck's ACM report was consistent with the reading on its frozen speedometer, and that he is not aware of any recalls affecting his interpretation of the data.

The ACM reports for the SUV and minivan showed that both vehicles were going approximately 66 m.p.h. five seconds before impact. The SUV's brake switch came on around 1.5 seconds before the crash, and the vehicle's speed "maintain[ed] if not [lowered] at half a second prior to impact."

---

[2] Elsewhere, Bacon testified that the service brake briefly came on one second before impact but noted that other data suggested that the impact had already occurred.

Sanchez testified in his own defense concerning the events of July 1st and 2nd. He had purchased the truck eight days before the crash as a gift for his estranged son on the condition that he live with Sanchez and had driven to Rosharon on the 1st to "try[] to bring hi[s son] back home." Sanchez had not previously driven the truck a long distance and was not "that familiar" with its "controls." On the way, he stopped in Austin to look for his girlfriend. Although he could not find her,[3] he saw a homeless man that he recognized and offered him $20 to accompany Sanchez to Rosharon because he "wanted company." Sanchez and his son visited for approximately two hours while the homeless man waited in Sanchez's truck. After reconciling with his son, who remained in Rosharon, Sanchez began the drive back to Lampasas around 4 or 5 p.m. He dropped off the homeless man in Austin, "stopped there where all the homeless were han[g]ing out at, and was just talking to them." Sanchez "lost track of a couple of hours" but eventually left for Lampasas. There were beers in the truck because he had bought the homeless man a six-pack, and, although Sanchez had asked the man to take them, "[a]pparently he didn't."

While heading north on U.S. 183 approximately two or three miles south of Briggs—a stretch of road that Sanchez drove "every day in that area at least three or four times a day"—he turned the truck's cruise control on "and didn't pay [any] attention to it." However, around one or two miles from Briggs, he looked at his speedometer and noticed that it was "marking 98," so he began panicking and attempted to turn off the cruise control. Although he "just didn't know the pickup" and "didn't know how to stop it," he did not try to brake. He testified that "[i]t's possible" that he accidentally pressed the accelerator pedal. As he attempted to turn off the cruise control, he "took [his] train of thought off the vehicle for a second or two";

---

[3] Sanchez testified that "[s]he was probably homeless."

9

when he at last looked up, "that's when [he saw] what [he] thought was a vehicle coming dead at him." Despite agreeing that the accident occurred in the "oncoming lane of traffic" and admitting that it was "possible" that he had been in the wrong lane, he testified that he saw "two yellow lights coming in [his] lane," that he "believe[d he] was in [his] lane," that he did not "in any conscious way" fail to maintain his lane, that he was in the "far right lane," and that he "[did]n't think [he] was in the oncoming lane." He testified that "the only thing that [he] can assume . . . is that [at] the last second, [he] swerved all the way to the left to avoid [Sheldon]." Sanchez asked himself "how come [he] didn't throw his pickup to the right," which is "what [commercial truck drivers are] taught."

Sanchez testified that he was not intoxicated, that he had not drunk any alcohol, that he was "wide awake" and was not tired, that he had drunk an energy drink, that he never "purposefully" sped, that he was not on his phone, and that he does not know why the ACM report showed that he was going 107 m.p.h. He suggested that perhaps it was a "cruise control defect" and explained that he had back and knee problems. When asked again on cross-examination whether he had been wide awake, however, he testified: "I really don't know how to answer that," "I thought I was awake," and "I question it."

Relatedly, he testified that he has had "[s]erious memory problems" since the crash, in which he sustained a "pretty severe head injury." His memory is "in and out," and he will sometimes forget family visits from the day before. When discussing the collision, "some[ ]times [he] can remember [it] more than others," and "sometimes [. . . he] forget[s] that [he] ha[d a] previous conversation." He testified that he had no explanation as to why the truck's ACM report showed that its cruise control was turned off in the five seconds before the crash: "I

10

pressed it off. It didn't shut off. I wasn't stepping on the gas pedal. The [speedometer] was going up."

On cross-examination, Sanchez testified about an open-container citation that he received on December 3, 2018, five months after the collision in this case. He at first testified that although the citation had not been for an open container, the citing officer "did find an open container, and [Sanchez] told him where [he] had dr[u]nk it, where it was." He next testified that he "got a ticket for open container" and a warning for driving on the wrong side of the road. Lastly, he testified that the officer found an open container in the back of Sanchez's truck, but he did not have an open container.

The jury found Sanchez guilty of two counts of manslaughter and two counts of aggravated assault with a deadly weapon.

During the punishment hearing, the State presented testimony from DPS Trooper Lorenzo Arroyo, the officer who cited Sanchez for an open-container violation in December 2018. Arroyo testified that he was driving on U.S. 190 when an 18-wheeler, attempting to pass another, crossed the center stripe into his lane and caused him to swerve to avoid being hit. He stopped the passing vehicle, which was driven by Sanchez. As Arroyo approached the cab of Sanchez's 18-wheeler, he smelled the odor of an alcoholic beverage and saw "some type of liquid coming alongside the cab . . . from front to back" on the passenger's side. When questioned, Sanchez responded that he had been drinking beer and that he had attempted to throw the can out of the window when Arroyo initiated the stop but that the can had bounced back into the cab. Arroyo cited Sanchez for open container in a motor vehicle and gave him a warning for "wrong side of road–not passing." Sanchez subsequently paid the ticket.

11

At the hearing's conclusion, the jury sentenced Sanchez to fifty years' confinement for each of his four convictions, and the trial court ordered that the sentences run concurrently. This appeal followed.

## DISCUSSION

### I.      Legal Sufficiency of the Evidence

In his first issue, Sanchez contends that the evidence supporting his convictions was legally insufficient. Specifically, he challenges the sufficiency of the evidence proving recklessness, asserting that "no evidence demonstrated beyond a reasonable doubt that [he] was aware of but consciously disregarded the risks of his actions." He argues that the evidence instead shows that he was "functionally distracted and disoriented when he entered the wrong lane at [107 m.p.h.] and swerved into the oncoming car" and that, whether asleep or "radically disoriented," he was "not taking any conscious [risk] or aware of any risk."

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We measure the sufficiency of the evidence against the hypothetically correct jury charge, which "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and

12

adequately describes the particular offense for which the defendant was tried." *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023) (quoting *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019)).

In conducting our review, we evaluate all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Thompson v. State*, 408 S.W.3d 614, 627 (Tex. App.—Austin 2013, no pet.); *see Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014); *see Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978) ("[P]roof of a culpable mental state generally relies on circumstantial evidence."). We presume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Our concern is whether the factfinder reached a rational decision. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally" (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010))).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *see also* Tex. Code Crim. Proc. art 36.13 (explaining that "the jury is the exclusive judge of the facts"). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility

13

of the evidence and substitute our judgment for that of the factfinder. *Arroyo*, 559 S.W.3d at 487. When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *see Musacchio v. United States*, 577 U.S. 237, 243 (2016) (reaffirming that appellate sufficiency review "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" (quoting *Jackson*, 443 U.S. at 319)). We must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton*, 235 S.W.3d at 778). The factfinder may rely on common sense and apply observation and experience gained in ordinary affairs when drawing inferences from the evidence. *Acosta*, 429 S.W.3d at 625.

A person commits the offense of manslaughter if he "recklessly causes the death of an individual." Tex. Penal Code § 19.04. A person commits the offense of aggravated assault with a deadly weapon if he "intentionally, knowingly, or recklessly causes bodily injury to another" and "uses or exhibits a deadly weapon during the commission of the assault." *Id.* at §§ 22.01, .02. Both offenses are result-oriented; the defendant's mental state must relate to the result of his conduct. *See Hernandez v. State*, 556 S.W.3d 308, 327 (Tex. Crim. App. 2017) (op. on reh'g); *Schroeder v. State*, 123 S.W.3d 398, 399–401 (Tex. Crim. App. 2003). A person acts recklessly, or is reckless, with respect to the result of his conduct "when he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." Tex. Penal Code § 6.03(c). The created risk "must be of such a nature and degree that its disregard

constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.*

In addressing the culpable mental state of recklessness under subsection 6.03(c), we must examine the defendant's conduct to determine whether:

> (1) the alleged act or omission, viewed objectively at the time of its commission, created a "substantial and unjustifiable" risk of the type of harm that occurred;
>
> (2) that risk was of such a magnitude that disregard of it constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation (i.e., it involved an "extreme degree of risk, considering the probability and magnitude of the potential harm to others");
>
> (3) the defendant was consciously aware of that "substantial and unjustifiable" risk at the time of the conduct; and
>
> (4) the defendant consciously disregarded that risk.

*Williams v. State*, 235 S.W.3d 742, 755–56 (Tex. Crim. App. 2007).

Conscious disregard of the risk created by the actor's conduct is at the heart of reckless conduct. *Id.* at 751. Mere lack of foresight, stupidity, irresponsibility, thoughtlessness, or ordinary carelessness are insufficient; the defendant must "actually foresee the risk involved and [] consciously decide to ignore it." *Id.* at 751–52. "Those who are subjectively aware of a significant danger to life and choose, without justification, to engage in actions (or in some cases inactions) that threaten to bring about that danger have made a calculated decision to gamble with other people's lives." *Id.* at 752. The defendant, however, "need not be aware of the specific risk of another's death in order to commit manslaughter." *Trepanier v. State*, 940 S.W.2d 827, 829 (Tex. App.—Austin 1997, pet. ref'd). A "combination of an awareness of the magnitude of the risk and the conscious disregard for consequences is crucial." *Williams*, 235 S.W.3d at 752–53.

15

Viewing the totality of the evidence in the light most favorable to the verdicts, we conclude that a rational juror could have found beyond a reasonable doubt that Sanchez was reckless with respect to the results of his conduct, namely, the deaths of Son and Wife and the injuries to Sheldon and Orsak. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360. The weather at the time of the collision was clear. The road was dry, and there were few vehicles on the highway. Sanchez had been a licensed commercial truck driver for approximately seven years at the time of the crash. He testified that he had received additional driving training, was aware of the importance of not driving while fatigued, knew that cruise control could be deactivated by braking, and agreed that driving 107 m.p.h. in the dark was "wildly negligent."

However, despite Sanchez's awareness of the risks, prior to the collision he had been awake for 17 hours, of which he had driven for several. There was no evidence of any mechanical issue with his truck; to the contrary, multiple witnesses who inspected the vehicle or reviewed its data testified that they had discovered no defects that could have contributed to causing the crash. Yet seconds before impact, Sanchez was going 107 m.p.h., from which the jury could have reasonably concluded that he was willfully driving over 40 m.p.h. in excess of the posted 65 m.p.h. speed limit. Per his own testimony and the truck's ACM report, he did not attempt to brake but instead took his eyes off the road while attempting to adjust the cruise control. Indeed, the report indicated that he almost uninterruptedly continued to press the accelerator pedal in the seconds before the crash. Viewed in a light most favorable to the verdicts, the report also contradicted Sanchez's testimony that it was possible he had pressed the accelerator by mistake, believing it to be the brake pedal. Sanchez's speed was relatively constant in the seconds before the collision, and pressure on the accelerator actually lessened—and briefly ceased before resuming—shortly before impact.

16

At some point, he veered into the southbound lanes and began driving the wrong way. Sheldon testified that Sanchez came directly toward him while driving at a slant and did not "jerk[]" or appear to take evasive action. Sheldon's testimony was supported by the truck's ACM report, which reflected that Sanchez drove "in a straight line" in the three seconds before impact. Although Sanchez testified that his memory was inconsistent since the accident, the jury could therefore have reasonably determined that he was not credible when he told Trooper Huntington after the collision that he had seen a vehicle ahead of him "weaving kind of in and out of traffic." Sanchez had no explanation for why he did not move to avoid Sheldon after seeing oncoming headlights; he testified that he did not "throw his pickup to the right" as he had been taught.

From this evidence, a reasonable juror could have agreed with one or more of Trooper Huntington's conclusions that Sanchez failed to control his speed, was speeding at the time of the collision, failed to maintain a single lane of travel, failed to keep a proper lookout, failed to control his motor vehicle, failed to stay awake while driving, and drove into oncoming traffic. Sanchez's conduct and similar acts and omissions have previously been determined to constitute sufficient evidence of recklessness. *See, e.g., Illinois v. Vitale*, 447 U.S. 410, 419 (1980) ("[R]eckless driving causing death might still be proved if . . . a driver who had not been paying attention could have avoided the accident at the last second, had he been paying attention, by simply swerving his car."); *Trepanier*, 940 S.W.2d at 829 ("The failure to maintain a single marked lane may also support a manslaughter conviction."); *Padon v. State*, No. 03-17-00695-CR, 2019 WL 4561392, at *7 (Tex. App.—Austin Sept. 20, 2019, pet. ref'd) (mem. op., not designated for publication) ("[T]he evidence at trial showed several acts by appellant that revealed conscious risk creation . . . including, not staying in her lane of traffic,

. . . not applying her brakes before the impact, not controlling her Explorer, [and] not attempting to maneuver to avoid the collision."). For the evidence to be sufficient, the jury need not have agreed on the means by which Sanchez was reckless. *See Manning v. State*, 84 S.W.3d 15, 20–21 (Tex. App.—Texarkana 2002), *rev'd on other grounds*, 114 S.W.3d 922 (Tex. Crim. App. 2003); *Miller v. State*, No. 03-07-00527-CR, 2010 WL 140390, at *6 (Tex. App.—Austin Jan. 13, 2010, pet. ref'd) (mem. op., not designated for publication).

Sanchez's suggestion on appeal that he possibly became "disoriented" and his insistence that the jury should have disregarded his testimony that he was "wide awake" run afoul of our obligation to view the evidence in the light most favorable to the verdict and the jury's role as the exclusive judge of credibility. *See Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 733. We must resolve any ambiguity or contradiction in the evidence in favor of the jury's guilty verdicts, *Zuniga*, 551 S.W.3d at 733, and legally sufficient evidence need not exclude every conceivable alternative to a defendant's guilt, *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). Moreover, there is no evidence in the record that Sanchez's mental state was affected by a medical episode. In fact, a bottle of pills and beer cans were found in his truck. And even were the jury to have believed that he was asleep at the time of the crash, as Trooper Huntington hypothesized, it would not have required a finding that Sanchez was not reckless. Rather, driving while deeply fatigued or unable to stay awake would qualify as reckless conduct. *Cf. Roy v. State*, 509 S.W.3d 315, 319 (Tex. Crim. App. 2017) (explaining, where defendant had passed out from intoxication at time of crash, that "a defendant need not be aware at the moment the result occurs if he can show that he consciously disregarded the risk of the result and the result came from the same conduct"); *Williams v. State*, 531 S.W.3d 902, 922 (Tex. App.—Houston [14th Dist.] 2017), *aff'd*, 585 S.W.3d 478 (Tex. Crim. App. 2019)

(concluding that any error in admitting expert's opinion testimony that defendant was reckless was harmless because "the State provided ample evidence from which the jury could find [defendant] was driving recklessly," including his admission "to ingesting medication and being in and out of consciousness while driving" and testimony that he "lost consciousness at least once before the accident").

The evidence presented at trial was legally sufficient to support Sanchez's convictions. Accordingly, we overrule his first issue.

## II.      Unfairly Prejudicial Testimony at Punishment Hearing

In his second issue, Sanchez contends that the probative value of Trooper Arroyo's testimony concerning Sanchez's open-container citation during the punishment phase of trial was substantially outweighed by the dangers of unfair prejudice and the jury's being misled in violation of Rule of Evidence 403. *See* Tex. R. Evid. 403. Although Sanchez acknowledges that testimony concerning the citation was admitted during the guilt-innocence phase of trial, he argues that Arroyo's testimony that Sanchez admitted to drinking a beer "prejudicially placed the idea of alcohol involvement in the mind of the trier of fact" with regard to the charged offenses. Sanchez also argues that the error was "exponentially compounded" by "[t]he lack of sufficient Tex. Code Crim. Proc. Article 39.14 or *Brady* notice." *See* Tex. Code Crim. Proc. art. 39.14(a) (requiring State, upon request, to allow defendant to view, inspect, and copy tangible evidence in the possession, control, and custody of State); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

Defense counsel did not object during Trooper Arroyo's direct examination and cross-examined the officer after the State passed the witness. Only once Trooper Arroyo had been released without objection from either party did counsel object and move for a mistrial:

> DEFENSE COUNSEL: We're going to object and would like to move for a mistrial, and we'll do a . . . bill of exception – in that we were never provided a video of this egregious drinking stop. Drinking was never alleged until now. We're guessing that would be under 39.14 or under the *Watkins v. State*, 619 S.W.3d 265, 273–91 (Tex. Crim. App. 2021), pro[geny] that we would have been entitled to get any of that information, since it's their punishment case and wildly egregious in a habitual case, and we had no idea that he was going to say that, and it was nowhere in discovery. So we would object.
>
> THE STATE: Judge, if I can respond. Are you done?
>
> DEFENSE COUNSEL: Yeah.
>
> THE STATE: Judge, I'm handing you what was admitted – I'm sorry – that is in the Court's file, file marked December 14th of 2021, which is the State's Second Supplemental Notice of Intent to Offer Evidence Pursuant to 404(b), 609, and 37.07. If you could note No. 1, Judge. It specifically lists the ticket and was provided to the defense.
>
> DEFENSE COUNSEL: Oh, I'm not talking about the ticket itself. I'm talking about the substantive testimony that was specifically different because this was an open container. He just said there was an admission of drinking and driving. That is a completely different act. We were not noticed of that nor did we have any idea whatsoever that he was going to say that, nor do we have the video, all of which could have been produced in the last four years.
>
> THE STATE: Judge, I also would like to point the Judge to the discovery log provided to the defense in this case, Judge, referring specifically to evidence provided on March 4th of 2020. This is an exact copy of what the Court received, and you will see that the ticket – that the ticket was provided to the defense, and you can see here that it was viewed by [defense counsel] on, I think, March 4th of 2020.
>
> DEFENSE COUNSEL: Again, we're not talking about the ticket. We're talking about the substantive testimony that was just said, not the ticket itself. Of course we knew about the ticket. We're talking about the new information, and we're saying they knew about that he was going to say that, and they didn't disclose it.

20

THE STATE: And, Judge, just so we're clear, the ticket specifically says "open container of alcohol," so I don't see how –

DEFENSE COUNSEL: How would we be on notice for consumption while driving in a manslaughter case? That's pretty distinctly different than an open container in the truck. Very different.

So, yeah, we did not have notice of it. That was a surprise attack, and we would object and move for a mistrial.

THE STATE: And, Judge, I think the trooper clearly said he did not arrest him for DWI. It was an open container that he discussed. And it was on the defense's cross of him that he started talking about a DWI investigation.

The trial court overruled defense counsel's objection and motion.

The State argues that Sanchez's objection was untimely, that it does not comport with his argument on appeal, and that this issue was therefore not preserved for appellate review. Sanchez asserts that "error was preserved for review by defense counsel by objection and a motion for mistrial, with argument."

Preservation of error is a systemic requirement on appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (citing *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005)). If an issue has not been preserved for appeal, we should not address the merits of that issue. *Id.*

To preserve a complaint for appellate review, a timely, specific objection must ordinarily be made and a ruling by the trial court obtained. Tex. R. App. P. 33.1(a). "To be timely, a complaint must be made as soon as the grounds for complaint [are] apparent or should be apparent." *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999). To be sufficiently specific, an objection need not employ "hypertechnical or formalistic . . . words or phrases," *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018); "magic words," *Ford*, 305 S.W.3d at 533; or a citation to a particular statute, *Laws v. State,* 640 S.W.3d 227, 229 (Tex.

21

Crim. App. 2022) (quoting *Ford*, 305 S.W.3d at 533). Rather, the objecting party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *see Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). "This gives the trial judge and the opposing party an opportunity to correct the error." *Pena*, 285 S.W.3d at 464 (citing *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005)).

The complaint on appeal must also comport with the objection made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *see Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) ("An objection stating one legal theory may not be used to support a different legal theory on appeal." (quoting *Johnson v. State*, 803 S.W.2d 272, 292 (Tex. Crim. App. 1990), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681, 685 n.6 (Tex. Crim. App. 1991))). Where it does not, nothing is presented for review. *Williams v. State*, 191 S.W.3d 242, 255 (Tex. App.—Austin 2006, no pet.); *see Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). In determining whether an issue on appeal comports with a trial objection, "we look to the context of the objection and the shared understanding of the parties at the time." *Clark*, 365 S.W.3d at 339 (citing *Lankston*, 827 S.W.2d at 911).

The State is correct that Sanchez did not timely object to Trooper Arroyo's testimony under Rule 403 or otherwise argue that the testimony was unfairly prejudicial, irrelevant, or would mislead the jury. Further, Sanchez's untimely objection was based solely upon perceived inadequate notice, and, because this legal theory is distinct from his issue on appeal, nothing is presented for review. *Lovill*, 319 S.W.3d at 691–92; *Williams*, 191 S.W.3d at 255.

22

## III.    Improper Argument

In his third issue, Sanchez contends that the State implied that "the defense wanted the jury to ignore the law" in the State's closing argument during the punishment hearing. He asserts that the "argument was an egregious exhortation which in fact urged the jury *not* to follow the law and instructions to consider mitigation evidence, and *not* to do their duty, but rather to impose the maximum sentence of life imprisonment in a mechanical fashion."

In her closing argument, defense counsel stated, "That's kind of the essential part of mercy and grace is, it's only grace when you don't deserve it. That's the deal. When you deserve it, it's not that anymore. It's something else." The following exchange then occurred during the State's rebuttal:

> THE STATE: Now, we all want to extend mercy. But if society doesn't follow the law, if we don't follow the law, if we, even worse, don't attach consequences to the violation of the law, then, I tell you what, you better stock up on goods, you better get the best gun you got, you better get fortified, because there are people who will come and take it from you.
>
> DEFENSE COUNSEL: Objection, Your Honor.
>
> THE STATE: And you can scream –
>
> DEFENSE COUNSEL: Is there – I guess this is improper argument.
>
> THE COURT: Overruled.
>
> THE STATE: And you can scream up and down all you want, but no one will hear you. Because why? Because of grace. We see what happens in cities across this nation where they don't punish people when they ignore the law.
>
> DEFENSE COUNSEL: Objection, Your Honor.  Just improper argument. Nobody has asked to ignore the law.
>
> THE COURT: Sustained.

THE STATE: Ultimately, my job is to present the evidence to you, and my job is to ask you to attach consequences to conduct. I can't make you. I can only ask you and try to show you why you should. It is up to you.

The State argues that Sanchez failed to preserve error regarding both of his objections during the State's closing argument, and we agree.

"Appropriate jury argument generally falls within only four areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) a plea for law enforcement." *Ex parte Scott*, 541 S.W.3d 104, 119 (Tex. Crim. App. 2017). However, "[t]he right to a trial untainted by improper jury argument is forfeitable." *Hernandez v. State*, 538 S.W.3d 619, 622–23 (Tex. Crim. App. 2018). "To preserve a complaint about improper jury argument for appellate review, a defendant must object and pursue the objection to an adverse ruling." *Owens v. State*, 549 S.W.3d 735, 744 (Tex. App.—Austin 2017, pet. ref'd); *see Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) ("To preserve error in prosecutorial argument, a defendant must pursue to an adverse ruling his objections to jury argument."). Pursuing the objection to an adverse ruling requires that the "defendant must contemporaneously object to the statement, request an instruction that the jury disregard the statement if the objection is sustained, and move for a mistrial if an instruction to disregard is given." *Canada v. State*, 547 S.W.3d 4, 22 (Tex. App.—Austin 2017, no pet.) (quoting *Johnson v. State*, No. 03-12-00006-CR, 2012 WL 1582236, at *7 (Tex. App.—Austin May 4, 2012, no pet.) (mem. op., not designated for publication)). "'[E]ven if an error' stemming from improper jury argument 'could not be cured' by giving an instruction to the jury, the defendant would still be required 'to object and request a mistrial.'" *Id.* (quoting *Mathis v. State*, 67 S.W.3d 918, 926–27 (Tex. Crim. App. 2002)). A defendant who fails to object or to

pursue an adverse ruling on his objection waives his right to complain about the allegedly improper jury argument on appeal. *Id.* (citing *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996)).

Moreover, even when a defendant objects, a general objection to "improper argument" is insufficient to preserve error. *Hougham v. State*, 659 S.W.2d 410, 414 (Tex. Crim. App. 1983) (concluding error was not properly preserved where defense counsel stated, "We will object to this line of argument" because objection "was clearly too general to apprise the trial court of the ground for his objection"); *Vasquez v. State*, 501 S.W.3d 691, 705 (Tex. App.— Houston [14th Dist.] 2016, pet. ref'd) (concluding that objection of "improper argument" failed to preserve error because it was "general, rather than specific, and the trial court did not make any statements that would indicate its understanding of the nature of the objection"). A "proper objection" would instead be "that the argument was outside the record, was not a reasonable deduction from the evidence, was not an answer to argument of opposing counsel, and was not a plea for law enforcement." *Hougham*, 659 S.W.2d at 414 (citing *Lopez v. State*, 628 S.W.2d 77, 81 (Tex. Crim. App. 1982); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973)). The sole exception to this rule is when "the very nature of the prosecutor's argument coupled with defense counsel's objection informed the court of the nature of the error," as evidenced by a statement of the trial court. *Everett v. State*, 707 S.W.2d 638, 641 (Tex. Crim. App. 1986) (finding objection to be sufficient where prosecutor argued in closing during guilt-innocence, "When you hear the rest of the evidence in this case, then you may decide [defendant's] life is in jeopardy, after you find out a little bit about him"; defense counsel objected "to that as being improper argument"; and trial court overruled objection, stating, "Just argue the evidence in this phase of the [h]earing").

In the present case, defense counsel objected twice to the State's closing argument. On the first occasion, she objected, "I guess this is improper argument," and the trial judge overruled the objection. We conclude that counsel's objection was too general to apprise the trial court of the basis for the objection and that Sanchez has consequently failed to preserve error on appeal. *See Hougham*, 659 S.W.2d at 414; *see also DeBolt v. State*, 604 S.W.2d 164, 169 (Tex. Crim. App. 1980) (determining that defense counsel's objection, "I just don't think it's proper jury argument," was "general and insufficient to preserve error").[4] Nothing in the record suggests that the trial court understood the nature of the objection from the substance of the State's argument and the objection's wording. *Cf. Everett*, 707 S.W.2d at 641.

Conversely, counsel's second objection—"Nobody has asked to ignore the law"—while sufficiently specific, was not pursued to an adverse ruling. The trial court sustained the objection, and counsel did not request an instruction to disregard or move for a mistrial. *See Canada*, 547 S.W.3d at 22; *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993). We cannot conclude from the record that an instruction to disregard would not have cured the error; thus, it was not preserved for appellate review. *See Anderson v. State*, 932 S.W.2d 502, 507 (Tex. Crim. App. 1996) (explaining that "only exception" to adverse-ruling requirement "occurs if an instruction to disregard would not have cured the harm").

For these reasons, we overrule Sanchez's third issue.

---

[4] A number of our sister courts have likewise found non-specific objections to jury argument insufficient to preserve error. *See, e.g.*, *Barron v. State*, No. 02-18-00240-CR, 2019 WL 6767835, at *3 (Tex. App.—Fort Worth Dec. 12, 2019, pet. ref'd); *Vasquez v. State*, 501 S.W.3d 691, 705 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Miles v. State*, 312 S.W.3d 909, 911 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *Davila v. State*, 952 S.W.2d 872, 878 (Tex. App.—Corpus Christi–Edinburg 1997, pet. ref'd); *Huggins v. State*, 795 S.W.2d 909, 912 (Tex. App.—Beaumont 1990, pet. ref'd).

**CONCLUSION**

Having overruled each of Sanchez's issues, we affirm the trial court's judgments

of conviction.

_____
Edward Smith, Justice

Before Justices Baker, Kelly, and Smith

Affirmed

Filed:   April 17, 2024

Do Not Publish